UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH JOHN BURKA,                    :
                                      :CIVIL ACTION NO. 3:16-CV-2443
          Plaintiff,                  :
                                      :(JUDGE CONABOY)
          v.                          :
                                      :
NANCY A. BERRYHILL,                   :
Acting Commissioner of                :
Social Security,                      :
                                      :
          Defendant.                  :
                                      :
_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI. (Doc. 1.) Plaintiff filed applications for benefits on December 15, 2014, alleging a disability onset date of April 11, 2014. (R. 19.) After he appealed the initial denial of the claims, a hearing was held on March 29, 2016, and Administrative Law Judge ("ALJ") Gerard W. Langan issued his Decision on June 14, 2016, concluding that Plaintiff had not been under a disability during the relevant time period. (R. 19, 34.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on October 13, 2016. (R. 1-6, 14-15.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on December 12, 2016. (Doc. 1.) He asserts in his supporting brief that the Acting Commissioner's

determination should be reversed or remanded for the following reasons: 1) the ALJ failed to explain the weight he assigned to the opinion of Plaintiff's treating pain management specialist; 2) the ALJ failed to explain the weight he assigned to the opinion of Plaintiff's treating orthopedic surgeon; 3) the ALJ erroneously failed to assign great weight to the opinion of Plaintiff's treating psychologist; and 4) the ALJ omitted credibly established limitations from the hypothetical question posed to the Vocational Expert. (Doc. 18 at 3.) After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

Plaintiff was born on August 23, 1974, and was thirty-nine years old on the alleged disability onset date. (R. 32.) He has a high school education and past relevant work as an electrician and carpet cleaner. (*Id.*)

### A.   *Medical Evidence*

The Court focuses on the medical evidence most relevant to Plaintiff's objections, that is evidence from his treating pain management specialist and associates, his treating orthopedic surgeon, and his treating psychologist.

### 1.   Pain Management Specialist

#### a.   *Office Notes*

Plaintiff was seen by Mikhail Artamonov, M.D., of Premier

Pain, Spine and Sports Medicine ("Premier") from December 2013 through March 2016. (R. 323-41, 422-65, 633-717.) He was also seen by Faizal Quereshi, P.-A.C., and other Premier providers during this time. (*Id.*, R. 625-32.) At his initial appointment on December 3, 2013, Plaintiff explained to Dr. Artamonov that he suffered a work injury in April 2010 when he fell off a platform and into a hole. (R. 323.) He was immediately taken to the hospital and examined but went back to work a week later. (*Id.*) His back pain continued to increase, he took some time off, and he went back to lighter work until he was laid off in December 2011. (*Id.*) In September 2013, Plaintiff had a lumbar fusion at L5-S1 which took care of the pain that had radiated into his legs but he continued to report mid-thoracic pain that radiated into his chest. (*Id.*) He told Dr. Artamonov that he gets occasional flare-ups of the pain and he rated the spasms at 10/10 in pain. (*Id.*) In general, he described his pain generally to be constant stabbing/burning which was aggravated by prolonged walking, standing, exercise, or stress. (*Id.*) Plaintiff reported that in the past he had cortizone injections which helped minimally, medication had helped moderately as had physical therapy and chiropractic treatment, and he used a TENS unit at home which helped. (*Id.*) His primary care provider had prescribed pain medications, and Plaintiff said he visited Dr. Artamonov to take over the management of his pain. (*Id.*) Physical examination

3

revealed the following:

> Thoracic Spine: Increased tone in thoracic
> paravertebral musculature. Tenderness to
> palpation in thoracic spine. No masses,
> scars, lesions noted.
>
> Lumbar Spine: Well healed scar noted.
> Palpation the lumbar facet reveals pain on
> both sides at L3-S1 region. There is pain
> noted over the lumbar intervertebral spaces
> on palpation. Palpation of the bilateral
> sacroillitis joint area reveals right and
> left-sided pain, with slight hypermobile SI
> joint. Palpation of the greater
> trochanteric bursa on both sides reveals
> mild tenderness. Lumbar paraspinal area
> moderately tender to palpation. Anterior
> flexion the lumbar spine is noted to be 50'.
> Anterior lumbar flexion does not cause pain.
> Extension of the lumbar spine is noted to be
> 10'. There is pain noted with lumbar
> extension.

(R. 324.) Dr. Artamonov diagnosed lumbago, thoracalgia, facet

joint syndrome, chronic thoracalgia (S/P work injury), history of

thoracalgia without having immediate residual pain, and secondary

myofascial pain syndrome. (*Id.*) Dr. Artamonov noted that he had a

lengthy discussion with Plaintiff and set out the following plan,

explaining that

> [t]he patient will be a candidate for a
> series of interventional diagnostic
> procedures, including facet joint and nerve
> blocks to identify the underlying pain
> source. Once diagnosis is confirmed, the
> patient will be a candidate for therapeutic
> radiofrequency ablation of the appropriate
> structure for long-lasting improvement. All
> these options were discussed with the
> patient. If the patient fails to respond to
> the above approach, a series of therapeutic
> epidural steroid injections can be performed

4

for palliative pain relief.
(*Id.*)  Dr. Artamonov prescribed OxyCodone and Diazepam.  (*Id.*)

On December 16, 2013, Dr. Artamonov decided to perform  facet blocks due to Plaintiff's presentation with severe mid-dorsal pain and examination which showed severe tenderness over the T8-T10 facet levels.  (R. 325.)

On December 23, 2013, Plaintiff reported sixty percent mid-back pain improvement after the facet blocks but he complained of severe low-dorsal pain.  (R. 326.)  Physical examination showed severe tenderness with pain reproduction so Dr. Artamonov decided to perform additional levels of facet blocks.  (*Id.*)

On December 30, 2013, Plaintiff noted improvement after the December 23rd procedure but he continued to have severe tenderness with pain reproduction.  (R. 327.)  Dr. Artamonov performed confirmative facet blocks.  (*Id.*)

On January 7, 2014, Plaintiff reported to Dr. Artamonov that the physical therapy and thoracic facet injections he had received over the preceding month had helped to decrease his pain but he continued to have mid thoracic pain that radiated into his chest with occasional flare-ups and spasms that he rated at 10/10 on a pain scale.  (R. 328.)  Plaintiff also complained of intermittent low back pain.  (*Id.*)  Physical examination showed tenderness to palpation of the thoracic and lumbar spine, anterior flexion of the lumbar spine ten degrees and extension ten degrees with pain noted

5

on lumbar extension.  (R. 329.)  Plaintiff was directed to continue
physical therapy, compound cream, and TENS unit, and he was
scheduled for follow-up testing.  (*Id.*)

January 2013 EMG of thoracic spinal muscles showed evidence of
T5-T6 and T11-T12 thoracic radiculopathy.  (R. 701.)

In late January Plaintiff was seen by Mr. Quereshi and Dr.
Artamonov and reported that he had mostly mild mid-thoracic pain
with some low back pain and flare-ups with over-exertion.  (R. 330,
332.)  Plaintiff wanted to decrease his pain medication.  (*Id.*)
The plan was to decrease medication and continue multidisciplinary
pain management including interventional, pharmacological, and
physical therapies.  (R. 333.)

At his March 2014 appointment with Dr. Artamonov, Plaintiff
reported that he continued to go to physical therapy three days a
week and he believed it was helping.  (R. 336.)  He said he
continued to have flare-ups and muscle spasms occasionally as well
as some burning and tingling in his left leg hat could last for
days.  (R. 336.)  Dr. Artamonov prescribed Gabapentin and Flexeril
for pain.  (R. 337.)

On April 8, 2014, Plaintiff reported to Mr. Quereshi that he
continued to have flare-ups and muscle spasms in his lumbar and
thoracic regions mostly with activity, and the burning and tingling
his left leg could last for a few days.  (R. 338.)  He said the
Gabapentin made him feel tired and "like a zombie" and the over-

the-counter medications he had tried did not help to alleviate his pain. (*Id.*) Plaintiff said he was otherwise doing fine. (*Id.*) Office records from this visit indicate that the CT of the lumbar spine done in January 2014 showed mild central disc bulging at L5-S1 and CT of the thoracic spine showed small osteophyte vs. ossification of anterior longitudinal ligament at left paracentral region of T8-9, contacting the ventral thecal sac. (*Id.*) In his Review of Systems, Mr. Quereshi noted that Plaintiff admitted to joint swelling of the left lower extremity, he denied muscle wasting but admitted muscle weakness, pain, tenderness, night cramps, and limitation of joint movements in the left lower extremity. (R. 338.) Mr. Quereshi also noted pain to palpation of the thoracic and lumbar spine and pain with lumbar extension. (R. 339.) Plaintiff was directed to continue his formal physical therapy and rehabilitation program with subsequent transition to a home exercise program, continue Flexeril but discontinue Gabapentin, and he was prescribed a Butrans patch for pain. (*Id.*)

On April 25, 2014, Pravin Patel of Premier saw Plaintiff for extreme pain in the right forearm and he administered a lateral epicondyle tendon injection. (R. 441.)

On April 28th, Plaintiff saw Mr. Quereshi for follow-up of his lumbar and thoracic pain. (R. 442.) Plaintiff reported continuing muscle spasms in his thoracic spine as well as burning and tingling in his right leg at times that could last for a few days but other

7

than that he was doing fine. (*Id.*) He said the Butrans patch helped to take the edge off his pain and physical therapy was also helping. (*Id.*) Physical examination showed pain on palpation in the thoracic and lumbar spine and pain was noted on lumbar extension. (R. 443.) Mr. Quereshi planned a continuation of medications and therapy and noted that a function capacity test would be scheduled. (*Id.*)

In May 2014 Plaintiff had several diagnostic tests. Dr. Artamonov performed a nerve conduction study of the upper extremities due to Plaintiff's complaints of neck pain with radiation to both upper extremities. (R. 444.) The study showed no evidence of cervical radiculopathy or peripheral neuropathy. (R. 445.) X-rays done to assess right shoulder pain showed a normal right shoulder. (R. 446.) Studies of the cervical spine showed minimal 2mm retrolisthesis of C5 on C6 that did not change with flexion or extension though flexion was slightly limited. (R. 447.)

Mr. Quereshi saw Plaintiff for follow-up of his right elbow epicondylitis on May 21, 2014. (R. 448.) He reported that he had some relief from the injection but he still had pain. (*Id.*) Mr. Quereshi noted that the repetitive movement performed in Plaintiff's work as an electrician was the cause of his problem. (*Id.*) He also noted that Plaintiff continued to wear a tennis elbow brace and had been taking NSAIDs but had minimal relief.

(*Id.*)  Examination showed excruciating tenderness over the lateral epicondyle above and below the elbow with painful pronation and supination.  (*Id.*)  Mr. Quereshi's recorded plan included intraarticular injection if the pain worsened, formal physical therapy once the pain was better controlled, and follow up with an orthopedic surgeon.  (R. 449.)

On June 14, 2011, Plaintiff reported to Mr. Quereshi that he continued to have muscle spasms in his thoracic spine but he felt it was not as bad with the combination of medication and physical therapy.  (R. 450.)  Plaintiff commented that although he had some relief from pain, he thought it was partially due to "not doing anything."  (*Id.*)  Physical examination continued to show tenderness to palpation in the thoracic and lumbar spine as well as gait dysfunction.  (R. 451.)

On June 25, 2014, Plaintiff saw Dr. Artamonov with the chief complaint of lumbar and thoracic pain.  (R. 452.)  He also wanted to have disability forms filled out.  (*Id.*)  On exmamination Dr. Artamonov found increased tightness and tone in the thoracic paravertebral musculature and moderate tenderness to palpation, pain with lumbar extension, and non-antlagic gait, (R. 453.)  He assessed severe chronic cervical thoracic spinal pain, cervical radiculopathy due to HNP, secondary myofacial pain syndrome, spinal facet joint syndrome, lumbar post-laminectomy syndrome, and significant functional disability.  (R. 453.)

August office visit notes indicate similar problems (R. 454-55) and September notes show that Plaintiff reported a hard time sitting for fifteen to thirty minutes but he felt his knee and shoulder were better.  (R. 456.)  Mr. Quereshi found increased tightness in thoracic paraertebral musculature T6-T10 with moderate tenderness to palpation and palpation of the lumbar facet joint produced pain.  (R. 457.)  He also reported that Plaintiff's gait was non-antalgic.  (*Id.*)  The plan included continuing to use the lumbar support and TENS unit.  (*Id.*)

In October 2014, Plaintiff reported to Mr. Quereshi that he had continuing pain in the thoracic and lumbar region, his pain limited his daily activities, and his pain increased with extra movement.  (R. 458.)  Plaintiff also said he had "intolerable muscle spasms" in his thoracic spine.  (*Id.*)  Physical examination showed increased tightness in the thoracic spine, anterior flexion of thirty degrees, anterior flexion did not cause pain, lumbar flexion of ten degrees with pain, positive slump test in right leg, and slightly antalgic gait.  (R. 459.)  Mr. Quereshi noted that Plaintiff may benefit from a function test to determine his level of ability.  (*Id.*)  He opined "[a]t this time the patient is 100% permanently partially disabled in terms of lumbar and thoracic injuries."  (*Id.*)

At his November follow up appointment, Plaintiff reported he was no longer able to do activities such as sit and read to his

daughter and go for car rides because he had to take breaks to move around after ten minutes.  (R. 460.)  Plaintiff also reported muscle spasms in his thoracic spine "all the time," and medication and physical therapy made the pain more tolerable.  (*Id.*) Plaintiff identified an increased pain level: where it was ordinarily recorded to be 4-5/10 with medication (R. 442, 448, 451, 452-53, 455, 459), he reported a pain level of 6-8 with medication (R. 461).  For the first time, Plaintiff reported depression due to pain which he identified as 2/10.  (R. 461.)  Physical examination was much the same as recorded in November but Plaintiff's gait was noted to be antalgic.  (*Id.*)

Plaintiff's subjective reporting was the same in December and Mr. Quereshi said the physical examination was unchanged from November.  (R. 462-63.)  Mr. Quereshi's plan included scheduling Plaintiff for treatment with consideration towards disc decompression, physiotherapy, soft tissue mobilization, active release technique and/or acupuncture as indicated.  (R. 463.) Plaintiff was to continued physical therapy and medication management.  (*Id.*)

On January 7, 2015, Plaintiff reported to Dr. Artamonov that he was experiencing "unbearable pain" in his left elbow as well as low and mid-back pain.  (R. 464.)  He said he had not been able to continue with massage and decompression due to insurance coverage problems.  (*Id.*)  Mr. Quereshi ordered MRI of the lumbar spine and

elbow "to delineate any soft tissue pathology which could account for the patient's persistent and otherwise refractory pain symptomatology."  (R. 464.)

January 26, 2015, MRI of the lumbar spine showed postoperative changes of prior posterior fusion of L5 and S1, minimal degenerative changes of the lumbar spine with no significant spinal canal stenosis or neuroforaminal narrowing.  (R. 703.)

At his February 4, 2015, office visit with Mr. Quereshi, Plaintiff reported radiating pain in his low back that extended into his right leg and caused numbness at times.  (R. 683.)  Lower extremity sensory examination showed decrease on the right leg to light touch and pinprick sensation using a pinwheel and antalgic gait.  (R. 684.)  Examination of the lumbar spine showed bilateral moderate tenderness, pain from the level of L2-L5, paraspinal muscle spasm, positive slumb test bilaterally, and decreased range of motion for flexion and extension (flexion of twenty degrees and extension of ten degrees).  (*Id.*)  Mr. Quereshi's plan included scheduling Left SIJ injections.  (*Id.*)

February 17, 2015, EMG and Nerve conduction studies of the lower extremities showed no peripheral neuropathy or lumbosacral radiculopathy. (R. 695.)  An electrodiagnostic study of the same date revealed no evidence of delayed nerve conduction throughout the spinal nerve roots, spinal cord, or brain stem.  (R. 693.)

In April 2015, Plaintiff told Mr. Quereshi that his pain had

gotten worse over the preceding few weeks and he had constant pain rated at 7/10 on average, which was aggravated by bending, lifting, standing and sitting for prolonged periods and improved with resting and medications. (R. 677.) In addition to the thoracic and lumbar region pain, Plaintiff complained of excruciating pain in his left elbow. (*Id.*) Mr. Quereshi noted that Plaintiff appeared uncomfortable and moved constantly to find a more comfortable position, he had bilateral moderate tenderness of he lumbar spine with pain from L2-S1, paraspinal muscle spasm and position slump test bilaterally. (R. 678.) Examination of the thoracolumbar spine showed diffuse tenderness over the lower thoracic and upper lumbar paraspinals, tenderness over the lower thoracic facets at the T8-T12 and over the upper lumbar facet at the L1 level bilaterally. (*Id.*) Mr. Quereshi also noted that extension, lateral bending, and rotation of the thoracolumbar spine appeared painful and limited, and range of motion of the lumbosacral spine appeared to be restricted in all planes, particularly in extension, lateral bending, and rotation. (*Id.*) Sensory exam was normal to light touch and gait was antalgic. (*Id.*) In his plan, Mr. Quereshi noted that Plaintiff presented with pain that was axial in nature and facet loading testing was positive on physical exam. (*Id.*) He commented that because of Plaintiff's severity of pain and failure to respond to more conservative modalities he recommended Plaintiff to proceed with

13

right and left T8-L2 facet joint injections "as diagnostic maneuvers toward delineating facetogenic pain generators . . . with the intent to proceed with radiofrequency if these diagnostic injections successfully offer the patient temporary relief." (R. 679.)

After receiving the facet blocks, Plaintiff reported on April 29, 2015, that he got 50% relief for a short period of time. (R. 673.) Physical examination was similar to that recorded earlier in April. (R. 674.) After receiving additional injections, Plaintiff reported on May 26, 2015, that he had 60% improvement afterwards but he had severe pain the mid-dorsal area. (R. 671.) Physical examination showed severe tenderness over identified facet levels with pain reproduction so the decision was made to perform additional facet blocks. (*Id.*)

In June 2015, Plaintiff said the he had significant pain reduction after the May 26th injections but that only lasted for a few days and the symptoms gradually returned. (R. 668.) Plaintiff requested that the procedures be repeated so he could continue with daily functioning and decrease in pain. (*Id.*) Plaintiff noted a different type of radicular pain that was excruciating and he had been having great difficulty performing daily activities. (*Id.*) He also noted he had right elbow pain. (*Id.*) Physical examination was similar to that recorded previously. (R. 66.) Further injections and testing were recommended. (*Id.*)

14

June 19, 2015 CR of the lumbosacral area showed straightening of normal lordotic curve and orthopedic fusion at L5-S1. (R. 689.)

On July 20, 2015, Plaintiff continued to report severe lumbar and radicular leg pain as well as right elbow pain. (R. 665.) Plaintiff expressed a fear that he was regressing--his ability to function and complete activities of daily living had declined, he was not sleeping well due to pain, the pain was aggravated by movement and sitting for extended periods. (*Id.*) He said his thoracic pain was severe due to spasms during which he was unable to move. (*Id.*) Plaintiff also said he did not like the way he felt when he took higher doses of pain medication and he got some relief from medication but not enough to function properly. (*Id.*) While many aspects of the physical examination were similar to those recorded previously, sensory exam was again decreased to light touch and pinprick sensation on the right lower extremity, gait was antalgic and Plaintiff was using a single point cane to assist with ambulation, and he had swelling over the posterior aspect of the right elbow with moderate pain to palpation and decreased range of motion. (R. 666.) Mr. Quereshi recommended a spinal cord stimulator trial because he had failed to respond to interventional epidural injections, facet joing injections as well as nerve blocks, and he had not responded with much relief of pain with the use of non-opioid and opioid medications. (R. 666-67.) Mr. Quereshi also recommended further testing for his back and

radicular symptoms as well as PRP treatments for his elbow.  (R. 667.)

In August 2015, Dr. Artamonov noted that Plaintiff's working diagnosis and comorbidities of concern had been established and documented in treatment reports and notes.  (R. 661.)  He also commented on the need for a functional capacity evaluation to base care on an evidence and outomes based approach.  (*Id.*)

On September 9, 2015, Plaintiff was seen by PA Joel Paradis of Premier.  (R. 656.)  He recommended radiofrequency ablation of the nerves for long-term pain relief.  (R. 657.)

Plaintiff saw Dr. Artamonov on October 29, 2015.  (R. 651.) Physical examination showed severe tenderness over the T9-T12 facet levels with pain reproduction.  (R. 651.)  Dr. Artamanov administered facet joint nerve blocks.  (*Id.*)  He did so after explaining Plaintiff's previous treatment history.

> The . . . patient has been treating in our facility in the comprehensive pain management program including interventional pain management.  To this point, the patient has experienced significant dorsal pain that is felt to be originating and in large part associated with the listed diagnosis of disc pathology, inflammatory radiculopathy, facet syndrome and resultant inflammation and facet imbridation.

(*Id.*)  Dr. Artamonov added that the decision to administer facet blocks was based on a "reasonable degree of medical certainty and in consideration of previous examinations and diagnostic workups." (*Id.*)

On November 2, 2015, Plaintiff reported to Dr. Armanotov that he experienced 60% improvement after the nerve blocks but he had severe mid-dorsal pain slightly higher than before. (R. 650.) Because physical examination showed severe tenderness with pain reproduction over identified facet levels, Dr. Artamonov decided to perform additional nerve blocks. (*Id.*) He repeated the history and treatment rationale set out at the previous visit. (R. 650, 651.)

On November 5, 2015, Plaintiff told Mr. Quereshi that the blocks had helped his pain--although he still felt "electrical spasms" across his low back the overall pain was reduced by 50%. (R. 647.) He requested that the procedure be repeated. (*Id.*) Physical examination showed that Plaintiff was wearing a lumbar brace; he had bilateral moderate tenderness in the lumbar region, positive slump test bilaterally, and pain to palpation over the lower thoracic and upper lumbar paraspinal muscles; multiple trigger points were identified in the thoracic region; extension, lateral bending, and rotations of the thoracolumbar spine appeared painful and limited; and there was pain reproduced with lumbar extension and positive lumbar facet loading. (*Id.*) December assessment was similar. (R. 644-46.)

On January 18, 2016, Plaintiff had radiofrequency ablation of left T8-T11 facet joints. (R. 643.) Notes include Dr. Artamonov's reasons for the procedure. (*Id.*)

17

The patient noticed good (over 75%) but
temporary improvement after the confirmative
Dx facet block.  Therefore, the decision to[]
perform RF was made. . . . To this point, the
patient has experienced significant dorsal
back pain that are cyclic felt to be
originating and in large part associated with
the listed diagnosis of facet syndrome and
resultant inflammation and central symptoms.

RFA has been prescribed for the
treatment of axial (non-radicular) dorsal
pain and the following conditions exist:
- Severe pain limiting activities of daily
living for at least 3 months despite
conservative treatments (structured exercise,
physical therapy including active muscle
conditioning, activity modifications,
including lumbar orthotics, non-
pharmacological managment - TENS and garment
application, pharmacological management,
etc.);
- Skeletal and neuro imaging studies confirm
that the principal cause of the axial low
back pain is not disc herniation, spinal
instability, fracture, malignancy, or spinal
stenosis;
- Within 6 months prior to the procedure, two
trials of diagnostic facet block injections
under flouroscopic guidance have been
performed and temporarily relieved at least
70% of the axial mid-back pain.
This determination is based on a reasonable
degree of medical certainty and in
consideration of previous examinations and
diagnostic workups.  Medical necessity and
efficacy have been established.

(*Id.*)

On February 25, 2016, Plaintiff reported to Mr. Quereshi that

he experienced 50% pain reduction after the January 18th treatment

but the pain gradually returned and he again reported severe lumbar

and radicular leg pain.  (R. 637.)  Physical examination findings

18

were similar to those recorded previously.  (R. 638.)  Plaintiff was informed that maximum efficacy of radiofrequency ablation may take as long as six to eight weeks.  (R. 639.)  He was encouraged to use ice packs, heating pads, gentle stretching and other conservative modalities.  (*Id.*)  Plaintiff also received a left lateral epicondyle injection for treatment of elbow pain.  (*Id.*)

On March 9, 2016, Dr. Artamonov again performed radiofrequency ablation.  (R. 636.)  He identified the need for the procedure and noted that he would repeat the procedure on the opposite side in two to three weeks.  (*Id.*)

On March 16, 2016, Dr. Artamonov administered paravertebral muscle injections to treat Plaintiff's severe residual pain and numbness as indicated by physical examination.  (R. 635.)

b.  *Opinion Evidence*

On April 29, 2014, Dr. Artamonov completed a Medical Source Statement in which he opined that Plaintiff could sit for zero to two hours with the need for "micro breaks every fifteen minutes"; he could stand/walk for a total of two to three hours with alternating between sitting and standing every fifteen minutes; he could rarely lift less than ten pounds, occasionally lift ten pounds, and never lift more than that; he could rarely use his upper and lower extremities for pushing/pulling; pain from his treatments that was occasionally severe enough to interfere with concentration needed to perform even simple work tasks; he would

likely be absent from work more than four days per month due to his impairments; he experienced fatigue due to treatment which could have implications for work activity; and his assessment was supported by MRI, CAT, radiculopathy, and chronic exacerbations. (R. 429-30.)

In a Pain Assessment form dated June 11, 2014, Mr. Quereshi identified Plaintiff's diagnoses, the sources of his pain, the clinical and laboratory findings which supported the diagnoses, and measures taken to alleviate pain. (R. 705-08.) He noted that Plaintiff's impairments were expected to last more than twelve months, he was not a malingerer, and his physical symptoms were not greater than what would be expected for the known physiological mechanisms. (R. 705, 708.) He assessed limitations similar to those found by Dr. Artamonov in April. (*See* R. 709-11.)

In October 2014, Mr. Quereshi opined "[a]t this time the patient is 100% permanently partially disabled in terms of lumbar and thoracic injuries." (R. 459.)

Mr. Quereshi's March 23, 2016, Medical Source Statement of Ability to Do Work-Related Activities (Physical) found similar lifting restrictions as well as findings that Plaintiff could sit/stand/walk for ten minutes at a time and he could sit for a total of three hours, and stand/walk for a total of two hours each; he needed a cane to ambulate; and he could occasionally climb stairs and balance but he could never climb ladders or scaffolds,

20

stoop, kneel, crouch, or crawl.  (R. 626-30.)

## 2.  **Orthopedic Specialist**

a.  *Office Notes*

Paul L. Kuflik, M.D., was Plaintiff's treating orthopedic specialist at Mount Sinai in New York.  (*See*, *e.g.*, R. 376.)  Prior to the September 2013 fusion surgery, Dr. Kuflik noted that he had made clear to Plaintiff that the surgery would not change his thoracic spine pain where he had multiple disc herniations and he thought Plaintiff would have a hard time getting back to work after surgery.  (*Id.*)

At a post-surgery follow-up visit in November 2013, Dr. Kuflik recorded that Plaintiff was doing well with regard to his surgery but he continued to have spasms in the thoracic spine probably related to disc herniations and degenerative disc disease.  (R. 371.)  He recommended that Plaintiff follow up with a pain management doctor.  (*Id.*)

In February 2014, Dr. Kuflik noted good surgical results but found numerous other problems including thoracic pain, neck pain, and tennis elbow.  (R. 370.)  In May he again recorded Plaintiff's complaints of thoracic spine pain and noted that Plaintiff was continuing with pain management.  (R. 369.)

In October 2014, Plaintiff reported to Dr. Kuflik that he continued to have thoracic pain and some right lower extremity numbness which Dr. Kuflik though could be related to the disease at

4-5.  (R 368.)  Dr. Kuflik noted that Plaintiff was to continue with his pain management doctor.  (*Id.*)

b.  *Opinion Evidence*

In a May 29, 2014, Medical Source Statement of Ability to Do Work-Related Activities, Dr. Kuflik assessed that, in an eight-hour day, Plaintiff could sit for zero to two hours, stand/walk for two hours; he could occasionally lift less than ten pounds, rarely lift ten pounds, and never lift more than that; he could rarely use upper and lower extremities for pushing/pulling; his pain would occasionally interfere with focus and concentration to perform even simple tasks; and he would be absent more than four days per month due to his impairments.  (R. 420-21.)

On June 23, 2014, Dr. Kuflik completed a Spinal Impairment Questionnaire.  (R. 414-19.)  His assessments were similar to those found previously.  (R. 416-17.)  He noted that Plaintiff's symptoms would frequently interfere with attention and concentration and he would need to take unscheduled breaks two to three times a day. (R. 418.)  Dr. Kuflik opined that Plaintiff's symptoms would likely increase if he were placed in a competitive work environment, he noted that Plaintiff was not a malingerer, he would likely be absent from work more than three days a month due to his impairments and his assessments applied as far back as June 3, 2013.  (R. 418-19.)

### 3.  __Mental Health Specialist__

Plaintiff was treated by Christopher Barker, Ph. D., who provided an opinion regarding Plaintiff's Mental Abilities and Aptitudes Needed to Do Unskilled Work on March 21, 2016.  (R. 623-24.)  Dr. Barker opined that Plaintiff was unable to meet competitive standards in his ability to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 623.)  He also found Plaintiff seriously limited in the following abilities/aptitudes: maintain attention for two-hour segment; sustain an ordinary routine without special supervision; complete a normal work day or work week; accept instructions and respond appropriately to criticism from supervisors; and deal with normal work stress.  (*Id.*)  Dr. Barker explained that Plaintiff would have difficulty working at a regular job on a sustained basis: "Medication and pain, complicated by depression, will result in distractibility and irritability[;] [l]imited movement creates frustration and difficulty focusing." (R. 624.)  He opined that Plantiff would miss more than four days per month due to his impairments or treatments.  (*Id.*)

### B. *ALJ Decision*

ALJ Langan issued his Decision on June 14, 2016.  (R. 19-34.) He found that Plaintiff had the severe impairments of status-post lumbar fusion, degenerative disc disease of the lumbar spine, lumbar stenosis, bilateral epicondylitis, depression, and anxiety

which did not alone or in combination meet or equal the severity of a listed impairment. (R. 21-22.)

ALJ Langan assessed Plaintiff to have the residual functional capacity ("RFC") to perform sedentary work except that he had to be

> afforded the opportunity to alternate between sitting and standing every thirty minutes. He must avoid unprotected heights and dangerous moving machinery. The claimant can never climb ladders, ropes, and scaffolding. He can frequently climb ramps and stairs. The claimant can occasionally tolerate exposure to extreme cold temperatures, wetness, and vibration. He is limited to simple, repetitive tasks with few workplace changes. The claimant can have occasional interaction with the public, co-workers, and supervisors.

(R. 23.)

Regarding the providers identified above, ALJ Langan recognized that Dr. Artamonov stated in a Medical Source Statement essentially that Plaintiff was not able to work due to significant limitations. (R. 24-25.) He noted that Mr. Quereshi's Medical Source Statement limited Plaintiff to less than a full range of sedentary work. (R. 25.) He did not identify the weight due Dr. Artamonov's opinion in that he did not mention the opinion in his review of opinion evidence. (R. 31.) ALJ Langan assigned no weight to Mr. Quereshi's opinion in the treatment records that Plaitniff is temporarily or totally disabled and his Medical Source Statement, stating that

> his statement that the claimant is temporarily or totally disabled are not a

full functional analysis and not supported by
the objective physical findings including no
neurological deficits.  Further, he is not an
acceptable medical source and while he is
another source deserving of consideration,
his exertional demands regarding
sitting/standing/walking and the postural
activities are too restrictive given the lack
of neurological deficits.

(R. 31.)

ALJ Langan assigned some weight to Dr. Kuflik's June 2014 opinion, finding it "too restrictive for the exertional demands regarding functions involving sit/stand/walk given his full motor strength.  The remainder of the opinion is fairly consistent with the residual functional capacity.  Absenteeism is also not supported by the record."  (R. 31.)  The ALJ also gave some weight to Dr. Kuflik's May 2014 opinion but stated that "the exertional limitations again are far too restrictive based on the overall clinical picture."  (*Id.*)

Regarding Dr. Barker's opinion, ALJ Langan gave it no weight because it was not consistent with the overall record of rather benign mental status examinations in his own examinations and records.  (*Id.*)

Because ALJ Langan found that Plaintiff had the RFC to perform jobs that were available in significant numbers in the national economy, he concluded that Plaintiff had not been disabled during the relevant time.  (R. 32-34.)

25

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 32-33.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

27

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the

28

record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error

would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

Plaintiff asserts that the Acting Commissioner's determination should be reversed or remanded for the following reasons: : 1) the ALJ failed to explain the weight he assigned to the opinion of Plaintiff's treating pain management specialist; 2) the ALJ failed to explain the weight he assigned to the opinion of Plaintiff's treating orthopedic surgeon; 3) the ALJ erroneously failed to assign great weight to the opinion of Plaintiff's treating psychologist; and 4) the ALJ omitted credibly established limitations from the hypothetical question posed to the Vocational Expert. (Doc. 18 at 3.)

### A.    *Treating Physician Opinions*

Plaintiff contends the ALJ erred by not reviewing Dr. Artamonov's opinion, by failing to explain the weight assigned Dr. Kuflik's opinions, and by assigning no weight to Dr. Barker's opinion. (Doc. 18 at 5-12.) Defendant responds that substantial evidence supports the ALJs assessments of medical source opinions. (Doc. 19 at 17-26.) The Court concludes this claimed error is cause for remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[2]  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[3]  "A cardinal principle

_____

[2]  A new regulation regarding weight attributed to a treating source affects claims filed after March 27, 2017.  For claims filed after March 27, 2017, 20 C.F.R. § 404.1520c eliminates the treating source rule.  In doing so, the Agency recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision."  82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017).  This case, based on claims filed on December 15, 2014 (R. 19), is not affected by the new regulation and is to be analyzed under the regulatory scheme cited in the text.

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

    Generally, we give more weight to opinions from

guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight, especially when

their opinions reflect expert judgment based on continuing

observation of the patient's condition over a prolonged period of

time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

(citations omitted); *see also Brownawell v. Commissioner of Social

Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject

the treating physician's assessment, an ALJ may not make

"speculative inferences from medical reports and may reject a

treating physician's opinion outright only on the basis of

---

> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it
> controlling weight. When we do not give the
> treating source's opinion controlling weight,
> we apply the factors listed in paragraphs
> (c)(2)(i) and (c)(2)(ii) of this section, as
> well as the factors in paragraphs (c)(3)
> through (c)(6) of this section in determining
> the weight to give the opinion. We will always
> give good reasons in our notice of
> determination or decision for the weight we
> give your treating source's opinion.

contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The review of ALJ Langan's Decision set out above indicates that he did not provide any explanation for not assigning controlling weight to Dr. Artamonov's opinion. Pursuant to the legal framework within which the analysis of opinion evidence is to be assessed, it was error for the ALJ not to review the opinion and/or explain weight assigned. Defendant's attempt to minimize this error is unavailing (*see* Doc. 19 at 18-19 & n.6) in that she cannot do what the ALJ was obligated to do in the first instance. *See*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 42, 44 n.7 (3d Cir. 2001).

To the extent Defendant argues that the opinions of Dr. Artamonov and Mr. Quereshi are the same and the ALJ properly discounted Mr. Quereshi's opinion (*id.* at 19 & n.6), the Court cannot conclude that ALJ Langan properly discounted the opinions of Mr. Quereshi. The ALJ does not point to any medical support for his conclusion that the lack of neurological deficits undermines treating source findings. (*See* R. 31.) Particularly given Dr. Artamonov's detailed explanation of findings supporting the need for radiofrequency ablation and consistent problems noted on physical examination by all Premier providers, it appears that ALJ

Langan substituted his lay opinion for that of providers.  In the
face of treating source opinions based on "continuing observation
of the patient's condition over a prolonged period of time," *see*
*Morales*, 225 F.3d at 317, the type of speculative inferences found
in the ALJ's decision could not be considered substantial evidence
in support of his conclusion that Premier providers opinions are
due no weight.  *Id.*

On this basis, remand is required for further consideration of
Premier treating provider opinions.  In the course of the
assessments, recognition that Mr. Quereshi provided valuable
treatment and evaluation is required although he was not an
acceptable medical source at the time Plaintiff filed this claim.[4]

---

[4]  For claims filed prior to March 27, 2017, CRNPs and PA-Cs
were not "acceptable medical sources." *See* 20 C.F.R. § 404.1502.
The importance of information from CRNPs and PA-Cs is indicated in
the definitional change for claims filed on or after March 27,
2017, which includes these practitioners in the definition of an
"acceptable medical source." *See* 20 C.F.R. § 404.1502(a).
Importantly, at the relevant time Mr. Quereshi was considered a
medical source, and, as such, evidence related to his treatment and
physical examinations are to be considered in evaluating the
opinion of a medical source and in making the determination as to
whether the individual is disabled.  SSR 06-03p, 2006 WL 2329939,
at *4.  Earlier, SSR 06-03p highlighted the relevance of evidence
from these practitioners in evaluating impairment severity and
functional effects:

> With the growth of managed health care in
> recent years and the emphasis on containing
> medical costs, medical sources who are not
> 'acceptable medical sources,' such as nurse
> practitioners[, and] physician assistants,
> have increasingly assumed a greater
> percentage of the treatment and evaluation of
> functions previously handled primarily by

Similarly, further evaluation of Dr. Kuflik's opinions is required because the cursory assessments of the opinions, which are consistent with those of the treating pain specialist, do not satisfy the ALJ's obligation of explaining his analysis.

Finally, upon remand the ALJ should consider Dr. Barker's opinion in conjunction with the opinions of treating sources. Dr. Barker based his assessed limitations on problems associated with Plaintiff's pain and medications. (R. 624.) Thus, just as the Court has concluded the ALJ's determinations regarding treating providers Kuflik, Artamonov, and Quereshi are deficient, further explanation is needed for the rejection of the consistent opinion of Dr. Barker.

## B.    *Credibly Established Limitations*

Plaintiff avers that the ALJ erroneously failed to include limitations assessed by treating providers and a consultative examiner in the hypothetical questions posed to the Vocational Expert. (Doc. 18 at 14-16.) Defendant responds that the ALJ included all credibly established limitations. (R. 26-28.) The Court concludes that this claimed error is cause for remand, particularly in light of the findings regarding the ALJ's consideration of treating source opinions.

The Third Circuit Court of Appeals has held that to accurately

---

physicians and psychologists.
SSR 06-03p, 2006 WL 2329939, at *3.

portray a claimant's impairments, the ALJ must include all "credibly established limitations" in the hypothetical. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (citing *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999)).

Insofar as the providers whose records are set out above were specialists (and their associates) who treated Plaintiff over an extended period, the ALJ must do far more than he has done to show, by substantial evidence, that the limitations identified by them were not credibly established within the legal framework provided by the regulations and the Third Circuit Court of Appeals.

The reconsideration required regarding treating source opinions which are clearly based on extended and extensive treatment of Plaintiff's back impairments and his elbow impairment must encompass a thorough explanation of what limitations identified by them are found not to be clearly established and what medical evidence supports the finding. Therefore, further consideration of this claimed error is not warranted at this time.

## **V. Conclusion**

For the reasons discussed above, the Court concludes Plaintiff's appeal is properly granted. This case is remanded to the Acting Commissioner for further consideration consistent with this Memorandum. An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: September 25, 2017